KING, Circuit Judge,
dissenting:
This is a fact-bound case, hard facts that have now made bad law. In a three-day trial, the Tax Court heard twenty-three witnesses, including seventeen of the twenty-nine diselaimants. The court made findings of fact that the majority cannot hold to be clearly erroneous, although much of the majority opinion amounts to that. Instead, the majority invokes the rule that we need not defer to fact-findings infected by an incorrect view of the law and goes on to set out what it perceives to be the correct view of the law: in determining whether a disclaimer is unqualified, “the correct standard requires a finding whether there was actual bargained-for consideration for the disclaimed ].” Majority Op. at 710. Under the rule promulgated by the majority, only “mutually-bargained-for consideration” will serve to disqualify the disclaimer. Id. at 710. Neither the statute nor the regulations impose such a requirement, and it creates ample possibilities for tax evasion. Only the naive or the uncounseled will engage in actual bargaining for the consideration to be received in exchange for a disclaimer or, as is the case with the six diselaimants that are the subject of the majority’s remand, will admit to it. I respectfully dissent.
It is useful to summarize what happened here. J. Edgar Monroe, the decedent’s husband, and Robert J. Monroe, his nephew, solicited and obtained disclaimers of specific bequests totaling $892,781 from twenty-nine legatees under Mrs. Monroe’s will. Within days of the execution of the disclaimers, each diselaimant received a check from Mr. Monroe for the amount of the disclaimed legacy. It is apparent, and the Tax Court so found, that the disclaimers and subsequent checks were not isolated events. They were part of a well-intentioned plan to secure to the legatees the amount of their bequests without diminution for the substantial taxes — in many cases, the tax haircut would have been seventy-five to eighty percent of the amount of the bequest — that would otherwise have been chargeable to those bequests.[1] The legatees from whom disclaimers were solicited were those who “had witnessed firsthand and had felt” Mr. Monroe’s generosity. In soliciting the disclaimers, Robert Monroe informed the legatees that taxes would substantially reduce the amount of their legacies and that Mr. Monroe was upset by the high taxes. Robert Monroe made a point of reminding the legatees that Mr. Monroe was a generous man.[2] The Tax Court found that: *716 The disclaimants may not have explicitly negotiated with or bargained with Monroe or the nephew for consideration in return for executing their disclaimers. Each of the disclaimants other than Tebo, however, was induced or, in some instances, coerced, into executing a disclaimer. Under these circumstances, the consideration for their disclaimers was the implied promise that they would be better off if they did what Monroe wanted them to do than if they refused to do so. Their disclaimers thus were not “unqualified” as required by section 2518.
Tebo is an exception because we are persuaded by her testimony that she voluntarily and without expectation of anything in return renounced her legacy for personal reasons....
In addition, petitioner has failed to persuade us that Monroe’s cash gifts to the 29 disclaimants were merely part of a pattern of generosity that Monroe had engaged in throughout his life. These “gifts” were all cash payments of specific and substantial amounts made to the disclaimants shortly after they executed disclaimers. The inference drawn from this targeted gift-giving is that Monroe made them “in return” for the disclaimants’ renouncing their bequests and not from a “detached and disinterested generosity.” ... Even if Monroe had no legal obligation to compensate the disclaimants, they anticipated, and received, payments from him that left them in the same economic position as if they had accepted the legacies in the first place.
The majority tells us that consideration consisting of a promise, the existence of which is fairly implied or inferred from what is actually said and done, of a gift or bequest in the full amount of the bequest disclaimed is not enough to disqualify a disclaimer. Instead, the majority requires explicitly negotiated or bargained-for consideration, presumably of the sort required to support a contract. The consideration requirement that the majority imposes on disqualification of disclaimers is actually more rigid than the consideration requirement in contract formation. It is hornbook law that an implied promise constitutes sufficient consideration to form a contract. See Arthur L. Corbin, Corbin on Contracts § 144 (1963) (“If a promisor bargains for another promise in return and gets it, he is bound. It makes no difference that the return promise is implied from conduct or from language that is not in the form of express promissory words. That is, it makes no difference with respect to the question of sufficiency of consideration.”). Yet the majority holds that an implied promise of remuneration such as the one found by the Tax Court in this case is insufficient to disqualify a disclaimer. As if that were not enough, the majority also tells us that, because disclaimer entails relinquishment of property, a disqualification “would seem to depend on the tangible receipt of property,” whatever that means. Majority Op. at 709.
To summarize, the majority’s conception of a disqualifying disclaimer possesses three, perhaps four, distinguishing characteristics. First, disqualification of a disclaimer requires the existence of explicit negotiations or bargaining. Second, the disclaimant must receive property, as distinguished from a promise of property, in exchange for the disclaimer. Third, the property received must consist of “ ‘consideration’ in the classic sense.” Majority Op. at 709. Fourth, because a check from Mr. Monroe in the full amount of the disclaimed bequest received a few days after the disclaimer would seem to constitute the kind of tangible property consideration for the disclaimer that would satisfy the second and third facets of the majority’s rule but somehow does not, the majority’s characterization of disqualifying disclaimers may also require that the disclaimant receive the tangible property be *717 fore the disclaimer. The estate argues for this position, and the majority arguably accepts it. All of these requirements result from an overly restrictive and unwarranted reading of the statute.
Section 2518 of the Internal Revenue Code defines an “unqualified disclaimer” as “an irrevocable and unqualified refusal by a person to accept an interest in property but only if ... such person has not accepted the interest or any of its benefits.” I.R.C. § 2518(b). The two statutory rationales for the Tax Court’s decision represent a fair reading of the statute. First, giving up the bequest “in return for” a gift is akin to accepting the benefits of the bequest.[3] Second, a refusal to accept a bequest from Mrs. Monroe “in return for” a gift from Mr. Monroe is not an unqualified refusal. Contrary to the reading adopted by the majority, the statute makes no mention of bargaining, tangible property, consideration or an enforceable obligation, and there is no warrant in the statute for compelling the Commissioner to litigate over these matters when challenging a disqualification.
The majority supports its reading of the statute by misreading Treas. Reg. § 25.2518-l(d)(l) to require that a disclaim-ant receive consideration in exchange for the disclaimer. As the Commissioner points out, the regulation describes several circumstances in which a disclaimant is deemed to have accepted the benefits of a legacy, the last among them (or, in the words of the regulation, “in addition” to the other circumstances listed in the regulation) being where the disclaimant accepts consideration in return for the disclaimer. The regulation cannot fairly be read to require consideration before disqualifying a disclaimer.
The majority likens the promise of gift or bequest implied from Mr. Monroe’s words and actions to a “mere expectation” or unenforceable hope of future benefit and rejects the implied promise along with the mere expectation. As the private letter rulings make clear, in the absence of an express or implied agreement, the mere expectation or hope that a disclaimant may one day benefit from the disclaimed property (generally in the form of an inheritance) is too speculative to form the basis for disqualifying a disclaimer. But the crux of the inquiry is whether there is an express or implied agreement. Based on all of the evidence before it, including evidence of the words and deeds of Mr. Monroe and Robert Monroe, as well as the legatees’ agreement to disclaim, the Tax Court reasonably deduced that an implied agreement existed between Mr. Monroe and the legatees. The Tax Court cannot fairly be read to have based its decision on a “mere expectation” or hope of future benefit on the part of the legatees.
Finally, the majority opinion contains a great deal of fact-finding, and the majority fails to acknowledge it as such. This case requires, first and foremost, credibility determinations about the testimony of Robert Monroe and the disclaimants, determinations properly relegated to the Tax Court. The Tax Court was not required to accept that testimony at face value, nor was it required to go through each piece of testimony and say that the court did not credit it. The Tax Court’s opinion makes very clear that the court simply did not credit much of what it heard. We overstep the bounds of our authority as appellate judges when we go back through an appellate record and make our own credibility assessments about the witnesses’ testimony. The majority opinion errs in that respect.
As is apparent from the majority opinion, no law addressing factual scenarios even remotely similar to the facts at issue here exists at the appellate level. The Commissioner accepts the concept of post-mortem tax planning, and until now the rules have been relatively clear. As Robert Monroe testified in the Tax Court, “the person renouncing ... can’t receive a benefit for signing a renunciation.” As for a subsequent gift or bequest, in Robert’s words, “you just couldn’t have a promise.” The Tax Court *718 found as facts that the disclaimants received a benefit for signing a renunciation, and that just such a promise existed. In order to overturn those fact-findings, the majority has now imported concepts of explicit bargaining, consideration and tangible receipt of property into a statute conspicuously devoid of them. I respectfully dissent.

. Provisions in Mrs. Monroe's will, coupled with the applicable tax law, operated effectively to impose the bulk of the estate and generation skipping transfer taxes on the legatees. If the legatees disclaimed, their bequests would fall into the residuary estate, which, under Mrs. Monroe’s will, passed to Mr. Monroe. Provided the disclaimers were qualified within the meaning of I.R.C. § 2518(b), Mrs. Monroe’s estate could reduce its estate tax burden by claiming the marital deduction for the amount of the bequests and could eliminate entirely the generation skipping transfer tax. Mr. Monroe clearly hoped to spare the legatees the tremendous tax burden they would bear if they took under the will by paying them the full amount of the bequests himself, largely out of the tax savings that inured to the estate, and therefore to Mr. Monroe as the residuary legatee, as a result of redirecting the bequests to the residuary estate.

. Neither Mr. Monroe nor Robert Monroe told the accounting firm responsible for the preparation of the estate tax return and for the related estate tax advice that the gifts had been made. The required gift tax return was not filed. The revenue agent who initiated the audit of the estate tax return did not find out about the gifts *716 until April 1991 when, during the course of the audit, he interviewed two of the donees, who told him about the gifts they had received. The agent testified that he scheduled the estate for audit because he thought it peculiar that employees of the Monroes who were earning less than $10,000 a year had renounced bequests of $50,000 each, plus one year's salary. Ironically, three of those employees testified that Mr. Monroe or Robert Monroe had told them that Mr. Monroe "would take care of it” or "see to it that [they] would get the full amount of money willed to [them] from the estate” and are subjects of the majority's remand.

. Treas. Reg. § 25.2518(d)(1) tells us that "[a]c-ceptance is manifested by an affirmative act which is consistent with the ownership of the interest in property.” Exchanging a bequest from Mrs. Monroe for a gift from Mr. Monroe can fairly be said to constitute an act that is consistent with ownership of the bequest.